## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **JOHN W. BOYD JR.,** | ) | |
| 68 Wind Rd. | ) | |
| Baskerville, VA 23915 | ) | |
| | ) | |
| **NATIONAL BLACK FARMERS** | ) | |
| **ASSOCIATION, INC.** | ) | **Civil Action No. 12-cv-1893** |
| 68 Wind Rd. | ) | |
| Baskerville, VA 23915 | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **JAMES SCOTT FARRIN** | ) | |
| 21 Pinestraw Way | ) | |
| Durham, NC 27713 | ) | |
| | ) | |
| **ANDREW H. MARKS** | ) | |
| 9513 Brooke Dr. | ) | |
| Bethesda, MD. 20817 | ) | |
| **Defendants** | ) | |

## COMPLAINT

## I.     INTRODUCTION

As set forth below, this complaint describes a history of relentless work by the plaintiff John W. Boyd ("Boyd") that resulted in tens of thousands of black farmers getting long overdue compensation and the defendant lawyers getting tens of millions of dollars in fees. In a shocking display of unmitigated greed and self-interest, not to mention betrayal of their own client, defendants have refused to compensate Boyd for work he did at their request, have sought compensation for themselves for work done by the plaintiff, and have failed and refused to seek compensation from the Court for thousands of hours of work done by Boyd.

John Boyd, President of the plaintiff National Black Farmers Association ("NBFA"), was the spokesperson and force behind the black farmer litigation, which recently settled before Judge Paul Friedman, *In Re Black Farmers Discrimination Litigation*, Civil Action No. 08-mc-0511 ("*Pigford II*"). For twelve years Boyd worked on resolving the claims of the 65,000 black farmers who were excluded from the original black farmers' class action, *Pigford v. Glickman*,  Civil Action No. 97-cv-1978 ("*Pigford I*") because they filed claims too late (at times "the late-filers").  For seven of those twelve years, Boyd worked alone— there were no lawyers involved in the cause, only Boyd. Boyd organized rallies, met with members of Congress and White House staff, mobilized farmers and farm advocacy groups, sought and obtained publicity for the cause and more. Through these efforts Boyd ultimately was responsible for the passage of the 2008 Farm Bill provision that allowed *Pigford II* to proceed through the filing of a complaint in court.

Defendants are attorneys who were retained by Boyd to represent NBFA as one of the lead plaintiffs in the *Pigford II* litigation and, as explained below, breached their fiduciary duty to NBFA.  Once the complaint was filed, defendants hired Boyd as a consultant to advise them on and help them with a legislative strategy. After using Boyd's services, relying on his advice and asking him to work tirelessly on their behalf and on behalf of the late-filers, defendants now claim that Boyd is owed nothing for his efforts. Defendants, who have claimed credit for all of the work done by Boyd, will be paid attorneys' fees and expenses in the tens of millions. Defendants' treatment of Boyd is not only disgraceful on a moral level, it is legal harm for which Boyd here seeks redress.

Without Boyd, *Pigford II* would not exist. Without NBFA and Boyd, defendants would not have had the credibility to convince black farmers to trust and retain them.

Without Boyd, the remedial legislation incorporated into the 2008 Farm Bill would not exist. Without Boyd, the $1.25 billion appropriated by Congress in 2010 to pay claims in *Pigford II* (and the fees and expenses of defendants) would not exist. There is no person or entity in the country that comes remotely close to doing what Boyd and NBFA have done, over the past 12 years, to make *Pigford II* a reality.  As set forth below, this is not the unsupported opinion of the plaintiff: Senators, Congressmen, and even President Obama have credited plaintiff with obtaining justice for the 65,000 late filers. Indeed, Boyd was invited by the White House to attend the presidential signing of the law that appropriated the funds for *Pigford II*. In the media, Boyd—not defendants and not any of the other lawyers that comprise Class Counsel in *Pigford II*--is routinely described as the person responsible for getting relief for the late-filers.

## II.     PARTIES

1.      Plaintiff John W. Boyd is a resident of the State of Virginia and President of Plaintiff National Black Farmers Association, Inc. ("NBFA").

2.      Plaintiff National Black Farmers Association, Inc. is a corporation organized under the laws of the Commonwealth of Virginia and with a principal place of business in the Commonwealth of Virginia.

3.      Defendant James Scott Farrin is a resident of the State of North Carolina.

4.      Defendant Andrew H. Marks is a resident of the State of Maryland.

## III.     JURISDICTION AND VENUE

5.      This court has jurisdiction pursuant to 28 U.S.C. §1332 as there exists diversity of citizenship between the plaintiffs and the defendants and the amount in controversy exceeds $75,000.

6.      Venue is appropriate in this judicial district pursuant to 28 U.S.C. §1391 as a

substantial part of the events giving rise to this controversy occurred within this judicial district.

## IV.      BACKGROUND FACTS

### Pigford I

7.      In 1997, a putative class of African American farmers brought suit in this Court

seeking to recover from the United States Department of Agriculture for decades of

discrimination. *Pigford v. Glickman*, Civil Action 97-1978 ("*Pigford I*").

8.      On January 5, 1999, pursuant to Fed.R.Civ. P 23(b)(3), the Court certified the

following class in *Pigford I*:

> All African American farmers who (1)farmed, or attempted to
> farm, between January 1, 1981 and December 31, 1996; (2)
> applied to [USDA] during that time period for participation in a
> federal farm credit or benefit program and who believed that
> they were discriminated against on the basis of race in USDA's
> response to that application; and (3) filed a discrimination
> complaint on or before July 1, 1997, regarding USDA's
> treatment of such farm credit or benefit application.

9.      On April 14, 1999 the *Pigford I* Court approved the terms of a Consent Decree to

resolve the claims of the class members. Under the terms of the Consent Decree, class members

were given 180 days after the entry of the Decree to file completed claim packages, i.e. until

September 12, 1999.  A late filing deadline of September 15, 2000 was established for class

members who could demonstrate that the late filing was due to extraordinary circumstances.

Over 20,000 individuals filed timely claim packages by September 12, 1999 and had their claims

decided through the process established in the Consent Decree. Between the September 12, 1999

deadline and the September 15, 2000 "extraordinary circumstances" extended deadline, over

60,000 individuals attempted to file claims. Approximately 2,700 of these claims were accepted

4

under the "extraordinary circumstances" exception; the remainder were rejected as late. After September 15, 2000, several thousand more claims were submitted and rejected as late. All told, approximately 65,000 individuals filed late claims that were not heard in *Pigford I* (hereinafter "the late filers").

### John Boyd Takes Up the Cause of the Late Filers: 2000-2007

10.     In 2000, Boyd began receiving phone calls and emails from black farmers whose claims had been rejected as late in *Pigford I*.  These farmers contacted Boyd because of his 15-plus year efforts and political activism on behalf of black farmers.  Boyd became concerned about the apparently large number of farmers whose claims were rejected as late and began to investigate the issue and to seek a solution.

11.     On September 12, 2000, at the urging of Boyd, Senator Charles Grassley held a hearing to investigate the plight of the late filers.  Alexander J. Pires, Jr. ("Pires"), co-lead class counsel in *Pigford I*, Boyd and others testified before the United States Senate Committee on Agriculture, Nutrition and Forestry about the late filers and how they might be added to the lawsuit.  At the hearing Mr. Pires predicted 20,000 late filers.

12.     Seeking to draw attention to the issue of the late filers, on December 11, 2000 Boyd traveled to Washington, D.C. with his mule, Struggle, and demonstrated on behalf of the black farmers in front of the United States Supreme Court in Washington, D.C.  Boyd's protest was reported on in the media.

13.     In late 2000, following the election of George W. Bush, Boyd met in Austin, Texas with President-Elect Bush and Agriculture Secretary designee Veneman to discuss issues pertaining to black farmers. Boyd asked President-Elect Bush what his position was on a resolving the claims of the late filers. President-Elect Bush indicated he did not know enough

about the case but would "try to come up with a remedy." President Bush specifically asked Boyd how long discrimination had been going on with the farmers.

14.     On January 4, 2001 President-Elect George W. Bush wrote to Boyd thanking him for the Texas meeting and enclosing a picture from the meeting.

15.     Following the meeting with President-Elect Bush, a meeting was arranged between Boyd and Secretary-Designate Veneman's Chief of Staff, Dale Moore. At that meeting Boyd and Moore discussed several issues pertaining to black farmers including relief for the late filers.

16.     In early 2001, Boyd met with the Congressional Black Caucus ("CBC") members to push support for the late filers.

17.     In July 2001 CBC member Bennie Thompson, a Democrat from Mississippi, introduced the first bill aimed at providing relief to the late filers. Boyd worked with Congressman Thompson on the bill. Thompson's bill, HR 2676, represented an important first step but did not garner sufficient support.

18.     Although the Bush administration and members of Congress had voiced their support to Boyd for the late filers, little was being done to move their cause forward and Boyd realized he would need to focus public attention on the issue. Over the spring and summer of 2002, NBFA, with Boyd at the helm, started organizing a large protest against the United States Department of Agriculture ("USDA").

19.     On August 17, 2002 more than 300 farmers from across the country attended Boyd's rally at the USDA. Many farmers rode in on farm equipment, others arrived on buses arranged by Boyd. The event was covered live on C-SPAN and reported on by the Washington Post. Boyd's rally was a turning point for the over 60,000 farmers who had been denied

participation in *Pigford I*: members of Congress now wanted to talk with Boyd about the case and the backlog.

20.     In the early months of 2003 Boyd started redoubling his efforts on behalf of the black farmers to meet with various members of Congress and the Congressional Black Caucus, who showed support for the farmers. In his effort to keep the issue alive, Boyd traveled 2-3 days a week to the halls of Congress, emailing, and talking with any staffers who would speak or meet with him.   During this time, Boyd met with Representative Max Burns, a Republican from Georgia, and worked with him on the Minority Farmers Fairness Act of 2003, a bill designed to provide relief to the late filers and other minority farmers claiming discrimination. The bill, which was introduced by Rep. Burns on April 8, 2003, failed to gain significant support.

21.     Undeterred by the failure of the early legislative efforts to help the late filers, in November 2003 Boyd set out from his farm in Virginia with one mule and began a 280+ mile journey to the White House to focus attention on the plight of the black farmers. The trip took Boyd 17 days. Peter Jennings did an extensive story on the black farmers, the struggle and the reason for Boyd's mule ride.   Boyd was named "Person of the Week" by ABC News. This unusual effort once again placed the spotlight on the black farmer and the late filers.

22.     When Boyd arrived in Washington, D.C. he was greeted by Senator Grassley and Congresswoman Maxine Waters who agreed to support the late filers.

23.     In 2004 Boyd continued to seek Congressional and administration support for the late-filers, by, *inter alia*, bringing public attention to the problem.   At Boyd's urging, the nonpartisan Environmental Working Group ("EWG") worked with Boyd on an investigation and analysis of the problems with the settlement in *Pigford I*, particularly the issue of the late-filers. In July 2004 EWG published the results of that collaboration with Boyd in a paper entitled

"Obstruction of Justice," which recommended Congressional action to provide relief to the late-filers.

24.     On September 28, 2004, Boyd held a rally in Washington, D.C. to coincide with a congressional hearing on the late filers and other black farmer issues.  Some 75 demonstrators attended this rally to speak on the continued refusal of the government to change the history of discrimination and take care of the late filers.  Boyd testified at the hearing and discussed the late filers.

25.     In the fall of 2004, Boyd met with Secretary of Agriculture Anne Veneman to discuss the late-filers and the possibility of legislation—a "late-filers bill"-- to remedy their situation.

26.     On November 18, 2004 the House Judiciary Committee held a hearing regarding the notice given to claimants in *Pigford I* and the high number of late-filers. Boyd was invited to testify at that hearing but was unable to attend; however, the work of John Boyd and EWG on the issue of the late-filers was noted and praised.

27.     On December 8, 2004, the Associated Press reporter ran a story about the late filers, quoting John Boyd and citing "Obstruction of Justice."

28.     In January 2005, the 109th Congress began its first session. Building on the momentum he had created in late 2004, Boyd pressed for legislation for the late-filers and continued to raise awareness of the problem. Boyd remained in constant contact with lead staffers on the House Judiciary Committee and held dozens of meetings with members, including: Steven Chabot (R-Oh.), John Conyers (D-Mi), Artur Davis (D-Al.), Bobby Scott (D-Va.), James Sensenbrenner (R-Wis.), and Maxine Water (D-Ca.). Boyd also continued to meet

with CBC members, and other members of the House and Senate, including Senators Grassley and Allen.

29.     On February 28, 2005 the House Judiciary Committee, Subcommittee on the Constitution, conducted a field briefing to examine "the current state of civil rights within the United States Department of Agriculture (USDA) in light of the 1999 *Pigford v Glickman* settlement." John Boyd attended and discussed the need for Congress to intervene on behalf of black farmers.

30.     At the request of the House Judiciary Committee, in March 2005, the Government Accountability Office conducted a study into the effectiveness of the notice in *Pigford I*.

31.     On July 21, 2005, at the USDA headquarters in Washington, Boyd met with USDA Secretary Johanns and others to discuss black farmers' issues.  The attendees included USDA Under Secretary Penn, Assistant Secretary of Civil Rights, Vernon Parker, General Counsel Kelly and Deputy Chief of Staff, Deberry.  At this meeting, for the first time, USDA officials indicated they might be receptive to and supportive of some form of relief for the late-filers.

32.     In the months following the USDA meeting, Boyd worked closely with Congressman Davis and several other members of the CBC to craft remedial legislation. These efforts culminated in the "African American Farmers Benefits Relief Act of 2005," H.R. 4398, which had stronger support in the House than the previous attempt at legislation but ultimately failed to move forward.

33.     In early 2006, Boyd began organizing a black farmers' rally for April 26, 2006. Boyd sent out press releases and reached out to, *inter alia*, the NAACP and the AFL-CIO for their support. On April 3, 2006 AFL-CIO President John Sweeney issued a statement in support

of NBFA's efforts on behalf of black farmers and the upcoming rally to be held in Washington, D.C. On April 18, 2006 Boyd received the support of the NAACP, which issued a press release focused on "70,000 farmers who had missed the deadline and deserve relief."

34.     On April 25, 2006, the day before the rally, Boyd was interviewed by Robert Siegel on National Public Radio (NPR). This interview included an overview of the "late filers" issue and Boyd's continuing leadership role on behalf of black farmers.

35.     On Wednesday, April 26, 2006, in a rally outside of the Department of Agriculture Boyd denounced Congress for refusing to grant relief to the late filers.

36.     The April 26, 2006 rally and the publicity surrounding it did not go unnoticed in the halls of Congress and in its aftermath Boyd pressed for and secured the support of additional senators (besides Grassley and Allen both of whom had already pledged their support). Boyd met separately with Senators Obama, Kennedy and Biden and each Senator agreed to support Boyd's efforts on behalf of the late-filers. Having spent 5 years developing considerable House support for the late filers, Boyd was now gaining ground in the Senate.

37.     In June 2006 Representatives Steven Chabot and Bobby Scott sponsored H.R. 5575, "The Pigford Claims Remedy Act of 2006," which Boyd helped to draft and which was the first House version of the bill that would ultimately be passed into law as part of the 2008 Farm Bill. Boyd was the driving force behind this bill.

38.     As a direct result of Boyd's efforts, 2006 also saw the first Senate attempt to help the late filers. In September 2006 Senators Allen and Grassley co-sponsored the Pigford Claims Remedy Act of 2006, Senate Bill 3976, which Boyd also helped to draft. Boyd was so closely associated with this effort, Senator Allen in a press release on September 28, 2006 referred to the bill as the "Boyd Claims Remedy Act."

39.    With both houses of Congress now supporting legislation for the late-filers, Boyd was hopeful and believed that the late-filers would finally have their claims heard in court. Accordingly, Boyd sought legal counsel to file a case on behalf of the late-filers. Unfortunately, Boyd was unable to find a lawyer willing to bring such a case.

40.    On November 16, 2007, Senator Grassley wrote to a letter to NBFA members in which he described Boyd as a "tireless advocate" and promised to continue to fight for the late-filers.

41.    On November 17, 2007 Representative Bobby Scott wrote a letter to Boyd praising him for his "tireless efforts to keep us on the case" and thanking him "for all the dedication, expertise, and guidance" in connection with the remedial legislation for the late-filers.

42.    As the year drew to a close, Boyd spent hundreds of hours working with members of Congress to get a law passed for the late-filers; however, Congress left for its winter break without passing remedial legislation.

**John Boyd's Efforts Culminate in Section 14102 of 2008 Farm Bill**

43.    When Congress reconvened in January 2007, Boyd immediately picked up where he had left off and recommenced work on both the House and Senate versions of the Pigford Claims Remedy Act. In addition, Boyd continued working with Congressman Artur Davis, who, in January 2007, re-introduced his own late-filers bill, H.R. 558, "The African American Farmers Benefits Relief Act of 2007."

44.    On January 20, 2007 Boyd wrote to Judge Paul Friedman, who had presided over Pigford I, and requested the names and addresses of the late filers. Boyd wanted to notify the late-filers about the status of congressional efforts on remedial legislation and ask them to

contact their senators and congressmen. However, citing privacy concerns, Judge Friedman would not release the names of the late-filers to Boyd.

45.     During January and early February 2007, Boyd secured the support of Senators Obama, Biden and Kennedy, who agreed to co-sponsor, along with Senator Grassley, the Senate bill.  The Senate version of the Pigford Claims Remedy Act, S. 515, was introduced on February 7, 2007 and was co-sponsored by Senators Grassley, Obama, Biden and Kennedy.  The House bill, H.R. 899, was introduced the same day and was again co-sponsored by Representatives Scott and Chabot.

46.     On February 7, 2007 Senator Kennedy wrote to Boyd and commended him for "keeping this major issue on the front burner" and for his "skillful work [that] will insure justice delayed is not justice denied."

47.     On February 14, 2007 then Senator Obama wrote to Boyd, thanking NBFA for its "diligence and commitment on behalf of African American farmers in this case."

48.     On February 8-10, 2007 Boyd held a rally of more than 500 farmers from across the Southwest in Dallas, Texas.  Speakers included members of Congress, USDA staff, and Boyd himself, who called upon black farmers to let their voices be heard by calling their senators and congressman and urging passage of the Pigford Claims Remedy Act.

49.     In the months following the introduction of S.515 and H.R. 899, Boyd worked relentlessly to ensure that the language was as beneficial to the late-filers as possible, to garner support both public and political for the measures, and to reach out to the late-filers.

50.     During 2007, Boyd personally met with Senate and House Judiciary Committee members and staffers, House Committee on Oversight and Government Reform staffers, House and Senate Agriculture Committee members and staff, USDA officials, CBC members and

others. Among the people Boyd met with to work on relief for the late filers were: Senate Majority Leader Harry Reid, Senator Barack Obama, Senator Tom Harkin (Chairman of the Senate Agriculture Committee), Senator Ted Kennedy, Senator Charles Grassley, Senator George Allen, Senator Mary Landrieu, Senator Richard Durbin (Majority Whip), Senator Patrick Leahy (Chairman Senate Judiciary Committee), Representative Steven Chabot (Member, House Judiciary Committee), Representative Robert ("Bobby") Scott (Member, House Judiciary Committee and CBC),   Representative John Conyers (Chairman of the House Judiciary Committee and leading member of CBC), Representative Benny Thompson (member of CBC), Representative Artur Davis, Representative Jerrold Nadler, Representative Maxine Waters, Michael Strautmanis (Sen. Obama's Chief of Staff),  Kimberly Betz (House Judiciary Committee staffer for Rep. Steven Chabot), Bobby Vassar (Chief Democratic Counsel, House Judiciary Committee), Mark Halverson (Senate Agriculture Committee staffer), Keenan Keller (Senior Democratic Counsel, House Judiciary Committee),  Larry Dillard (Aide and Communications Director for Rep. Bobby Scott) and others.

51.     In July 2007 the House introduced a new version of the Pigford Claims Remedy Act of 2007, HR 3073, sponsored by Representatives Conyers, Chabot, Scott, Davis, Nadler and Sensenbrenner. This bill was ultimately incorporated into the House version of the 2008 Farm Bill, which passed the House on July 27, 2007.

52.     On August 3, 2007, Senator Obama introduced Senate Bill 1989, a version of the Pigford Claims Remedy Act of 2007 that was identical to the House version; with this development the stage was set for passage of remedial legislation to help the late filers.

13

53.     On September 21, 2007 Boyd organized an information session in South Carolina for late filers; about 200 farmers attended.  This was an effort by Boyd to start educating the late filers of the pending legislation and to get their support.

54.     On November 20, 2007 a press release was issued by Senator Obama's office detailing a Town Hall meeting held in South Carolina to discuss black farmers and other rural issues.  Boyd was the principle speaker.

55.     In December 2007, S. 1989 was incorporated into the Senate version of the pending farm bill, which was passed by the Senate on December 14, 2007.

56.     Beginning in February 2008, Boyd attended the 2008 Farm Bill conference committee meeting. The conference committee is the process by which the House version and Senate version of the 2008 Farm Bill were reconciled. Boyd was one of only a handful of non-legislators permitted to attend and was there to ensure that the late-filers legislation was incorporated into the final version of the farm bill and was not stripped out during this process.

57.     On May 13, 2008 the conference report on the 2008 Farm Bill was issued by the conference committee. On May 14, 2008, the House agreed to the reported bill and on May 15, 2008 the Senate did the same.

58.     On May 14, 2008 Boyd testified before Congress about the ongoing concerns of the black farmers and the late filers.

59.     On May 15, 2008 President Bush vetoed the 2008 Farm Bill; however, Congress overrode the President's veto and on May 22, 2008 the 2008 Farm Bill, including Section 14102, which provided relief to the *Pigford I* late-filers, became law.

60.     On July 7, 2008 Boyd was featured in an article in Roll Call entitled "Sowing Seeds of Victory" which described his "integral role in securing the biggest Congressional

victory in history for black farmers, a $100 million line item in this year's farm bill that effectively reopened the government's discrimination settlement with black farmers."  Ana Palmer, *Sowing Seeds of Victory*, Roll Call, July 7, 2008.

**With Legislation in Place and $100 Million Available to Pay Claims, Enter the Lawyers**

61.     With the passage of the 2008 Farm Bill, the late-filers were given a new opportunity to seek compensation against USDA; however, pursuant to Section 14102, the late-filers needed to file a lawsuit in order to avail themselves of the relief provided by the new law.

62.     Boyd sought an attorney to represent NBFA and its members in such a lawsuit. Unlike his earlier efforts, which yielded no interested attorneys, this time Boyd was able to obtain counsel: Defendant McFarrin agreed to undertake that representation, along with defendant Marks, and on June 2, 2008 a complaint was filed in this court, *National Black Farmers Association v. Schaffer*, Civil Action 08-cv-940 (PLF), naming 823 NBFA members who had been denied relief in *Pigford I* and describing NBFA as the "moral voice of this lawsuit." *National Black Farmers Association v. Schaffer*, C.A. 08-cv-940, pp. 5-6, ¶¶3-4.

63.     On June 4, 2008, Associated Press ran a story about the NBFA lawsuit; although the NBFA was not the first plaintiff to file under Section 14102, it was the first lawsuit to receive national press. Greg Edwards, *Black Farmers Bring Suits Against USDA*, Associated Press, June 4, 2008.

64.     Immediately after the NBFA lawsuit was filed, settlement negotiations to resolve the claims of all late-filers began between USDA and attorneys' for the late-filers, including defendant Marks.   Before long, it became clear that the Department of Justice ("DOJ"), on behalf of USDA, took the position that the 2008 Farm Bill provided a cap on the amount available to pay the claims of the late-filers.

65.     In view of the known number of late-filers (over 65,000), it was clear that if the $100 million provided by the 2008 Farm Bill was the only money available to pay claims, it would not be enough to pay all the successful claimants. Having secured the vehicle needed to revive the claims of the late-filers, Boyd now turned his attention to getting additional money appropriated to pay those claims.

66.     For the next two and half years, Boyd would continue to work on getting relief for the late-filers, this time seeking more than ten times the funds appropriated by the 2008 Farm Bill. During this time, Boyd would meet with members of the House and Senate, Hill staffers, White House officials, attorneys from the Department of Justice, officials from the Department of Agriculture, including the Secretary, and report to Marks, Farrin and other attorneys representing late-filers about those meetings and his progress on getting additional funding for the case. Boyd would also arrange meetings between the lawyers and legislators/Hill staff, and hold rallies and meetings around the country where he would encourage Black farmers to join the lawsuit and to make their voices heard on the need for additional relief. In short, while lawyers were finally interested in the cause of the late-filers, it was Boyd who would still be the one doing the lion's share of the work on the political side.

**Boyd Works to Get Additional Funding for the Late Filers and Tours the Country Helping His Lawyers Inform the Late-Filers About the Case: 2008-2010**

67.     On July 14, 2008, six of the law firms that would ultimately be appointed as Class Counsel (James McFarrin, Pogust, Braslow & Millrood, Chestnut Sander, McEachin & Gee, Conlon Frantz & Phelan and Phillip L. Fraas) sent a letter to thousands of late-filers advising them that this "group is the only one endorsed by the National Black Farmers Association and its President Dr. John Boyd, Jr."  At the request of his lawyers, Boyd held several rallies for the late-filers under the auspices of NBFA; the expense of these rallies was paid for by defendant

Farrin—including the cost of mailing informational fliers to tens of thousands of putative claimants. On these fliers was an '800' number for Class Counsel. On occasion one or more lawyers from the aforementioned firms, including defendant Farrin, would attend Boyd's rallies to meet with the late-filers.

68.     Beginning in June 2008 and continuing through 2010, Boyd participated with his lawyers (defendants herein) and, at times, other members of Class Counsel, in "legislative strategy" conference calls where Boyd would update the lawyers, including defendants Marks and Farrin, about his legislative, executive and public relations efforts to secure additional funding for the late-filers and would recommend strategies for the lawyers to pursue.

69.     At times, lawyers from defendant Marks' law firm (at times, the "Crowell lawyers" or the "Crowell team"), Crowell & Moring, requested that Boyd set up meetings for them with members of Congress and their staff or requested to attend meetings that Boyd had scheduled for himself with lawmakers or their staff. Whenever possible, Boyd secured the requested meetings and brought the Crowell team to his own meetings.  At the request of his lawyers, defendants Farrin and Marks, Boyd introduced members of the Crowell team to Rep. Artur Davis, Rep. John Conyers, Rep. Bobby Scott, Chanelle Hardy, Keenan Keller, Bobby Vassar, Larry Dillard and many others. Boyd also continued meeting on his own with lawmakers and members of the administration.

70.     On Capitol Hill, Boyd served as the eyes and ears of his lawyers; he also carried their messages to legislators and relayed messages back.

71.     From the outset of his relationship with the defendants, Boyd made clear that he expected and needed to be paid if he was going to continue working on late-filer legislation. Boyd expressed to defendant Farrin that he had worked 8 years with no help and no pay and that

he could not continue this work without compensation. Defendants agreed to pay Boyd for his time and expenses. In August 2008, Boyd requested that Farrin reaffirm the agreement to pay Boyd for his time; Farrin did so.

72.     During 2008 and part of 2009, defendant Farrin made payments to Boyd for some of the work he was performing; however, in 2010 Farrin told Boyd he could not afford to pay him anymore but that he would pay Boyd when he was able. He requested that Boyd continue to work on getting funding for the late-filers and on his outreach efforts. Because he trusted his lawyers, Boyd continued to work for defendants Marks and Farrin with the understanding that he would eventually get paid.

73.     On February 20, 2009, DOJ filed a motion for class certification, seeking to certify a limited fund settlement class consisting of the *Pigford I* late-filers. In its motion, DOJ took the position that the $100 million appropriated by the 2008 Farm Bill was a cap on the amount that could be paid to the late-filers.

74.     In response to DOJ's filing, Boyd redoubled his efforts on Capitol Hill and at the White House. The same day the brief was filed, Boyd spoke to newly appointed Secretary Vilsack to express his displeasure over the position taken by DOJ in its representation of USDA and expressed NBFA's position that USDA could not claim it was trying to solve the problems of black farmers while seeking to limit their compensation in court. Boyd also immediately set up meetings with CBC members, including Rep. John Conyers, Rep Maxine Waters, and Rep. Artur Davis, to let them know about this development. Responding to Boyd's concerns, CBC members met with administration officials, including Attorney General Eric Holder and Secretary Vilsack, to discuss the matter and press for action.

75.    In March 2009, Boyd announced that he would be holding a rally in April to protest the Obama administration's position, as taken by DOJ, that relief for the Black farmers was limited to $100 million.   On April 8, 2009, Secretary Vilsack announced "Black Farmer week," which was part of a larger effort to defuse Boyd's planned rally.   On April 9, 2009, Boyd received an email from a confidential source within USDA, advising him that Secretary Vilsack had sought ideas on how to effectively kill Boyd's planned rally and had discussed reaching out to other farm groups to urge their members not to attend the protest. On April 22, 2009, one week before Boyd's rally, Class Counsel Rose Sanders issued a press release urging farmers *not to attend* the rally. On April 24, 2009 Ralph Paige, head of the Federation for Southern Cooperatives, issued a press release praising "USDA's Historic Actions to Assist Minority Farmers," and making no mention of USDA's attempt to limit the recovery of the late-filers to $100 million. Despite considerable opposition—even from Class Counsel and other farm groups-- Boyd held the rally on April 28, 2009, garnering much media and political attention.

76.    In the lead up to the rally, Boyd had multiple meetings with Senator Grassley and Senator Kay Hagan, who, on May 5, 2009, co-sponsored a bill, (S. 972) to allow the claims of late-filers to be paid from the judgment fund.

77.    On May 9, 2009 President Obama announced that he would seek $1.15 billion in the 2010 budget to fund a settlement process for the late-filers.

78.    In June 2009 Boyd pressed House Judiciary Committee Members and staff to meet with DOJ officials to discuss relief for the late-filers and the litigation positions taken by DOJ.  After the meeting, Boyd was briefed about what happened at the meeting, and was asked by committee members to help prepare a strategy for moving forward with a legislative solution that could allay the concerns of DOJ while providing relief for the late-filers.

79.     Throughout the spring and summer of 2009, Boyd worked day and night on a legislative solution. As a part of the efforts, Boyd met with legislators and their staff, USDA officials, and DOJ officials. Boyd also pushed for and kept abreast of meetings between legislators and administration officials (USDA and DOJ). At the request of Farrin and the Crowell team, Boyd provided talking points, co-prepared with the lawyers, to be used by congressmen and their staff in support of additional funding for the late-filers.

80.     Boyd's ongoing work on legislation for the late-filers was recognized by Representative Charles Rangel who wrote to Boyd on June 12, 2009, acknowledging his "efforts to address this issue and keep these deserving black farmers a priority in the 111th Congress."

81.     On June 21, 2009 the Washington Post ran a front-page feature story about Boyd's 8 ½ year effort to obtain relief for the late-filers. The reporter, who followed Boyd as he made the rounds on Capitol Hill, posed the question, "What kind of man does this? Drives and drives?  Week after week? Year after year? Making it his life's work." Krissah Thompson, *A Quest to Be Heard*, Washington Post, June 21, 2009 at A-1.

82.     As 2009 was drawing to a close, Boyd and the Crowell team, along with attorney Phil Fraas, were pushing for an appropriation to provide the $1.15 billion in additional funds for the late-filers. These efforts came very close to succeeding; however, it appeared that the Obama administration was not supporting the measure. As usual, Boyd was sent to find out what was going on. The Crowell lawyers asked Boyd: 1) for a "White House push;" 2) to find out whether Secretary Vilsack had contacted any members of Congress to express support for the appropriation; 3) to reach out to Congressman Conyers for help; and 4) determine whether the CBC might put their weight behind a request to the White House. Boyd immediately sought a meeting with President Obama, sending a very strongly worded letter to President Obama, his

top advisers, Secretary Vilsack, and the Assistant Attorney General for the Civil Division, asking for White House leadership to get the $1.15 billion into the DOD budget. Boyd also made contact with Secretary Vilsack's senior adviser to find out which members of Congress the Secretary had contacted concerning the bill.  Boyd sent an email to House Judiciary Committee Counsel and staff expressing his concern that members of Congress were pushing for funding to clear up the backlog of administrative cases at USDA but were not seeking funding for the late-filers. Boyd contacted Conyers' staff to discuss the Congressman's position. Finally, Boyd obtained a draft of a letter from CBC members to President Obama asking the President to appropriate the promised $1.3 billion for the late-filers.

83.    Despite the efforts of Boyd and others, Congress recessed without appropriating funds for the late-filers.

84.    After the failure of the 2009 legislative efforts, Boyd met with Michael Strautmanis and Valerie Jarrett, top advisers to President Obama, to find out why the White House had not pressed for congressional action on the late-filers. Boyd was informed that, although the President supported the idea of legislation to help the late-filers, the White House favored a broader bill that would also resolve claims for relief asserted by Native Americans against the Department of the Interior in the case of Cobell v. Salazar, which had settled on December 9, 2009 but required implementing legislation. Boyd agreed to support this broader relief.

85.    From February 6, 2010 through February 15, 2010, at the request of defendants, Boyd held 8 rallies across the South, culminating with a rally on President's Day in Washington, D.C. These rallies were announced and promoted by a flyer that was printed and sent out by defendant Farrin. At the bottom of the flyer was an "800" number that was set up by Farrin and

rang at offices staffed by Farrin. Boyd's rallies were covered by press and many were heavily attended and, at some, members of Congress attended and spoke to the farmers.

86.     On February 10, 2010 Class Counsel and the Department of Justice entered into a Settlement Agreement to resolve the claims of the late-filers (the "Settlement Agreement").  The "Settlement, however, was premised on the appropriation by Congress of an additional $1.15 billion (additional to the $100 million previously appropriated by the Farm Bill)." *Pigford II*, Document 162. In other words, in the absence of congressional action, the Settlement Agreement was worthless.

87.     Immediately following the execution of the Settlement Agreement, Boyd began working with staff from Speaker Pelosi's office, including Chief of Staff, Cheryl Parker Rose, on remedial legislation, including an appropriation, that would include the late-filers and Cobell.

88.     On March 9, 2010 H.R. 4783, the Claims Resolution Act ("CRA"), was introduced in the House and passed the following day. The CRA included relief for the late-filers, Cobell and others. In a press release praising the passage of the CRA, Congressman Bobby Scott stated, "Had it not been for the insistency and consistency of John W. Boyd, President of the National Black Farmers Association, urging the branches of the US government to right this injustice, none of it may have occurred."

89.     Although the House had passed the CRA, it had not designated the source of the funds to pay for the relief as was required by budget rules. For the next several months, Boyd continued working with Speaker Pelosi's office and others lawmakers to get a supplemental appropriation to fund the Settlement Agreement.

90.     On March 24, 2010 Senator Mary Landrieu issued a press release calling on Congress to approve the $1.15 billion needed to fund the claims of the late-filers and

"commend[ed] John Boyd and the National Black Farmers Association for their tireless effort in getting us to this point."

91.     On April 1, 2010 CQ Today featured an article on the issue of funding for the CRA, which focused on Boyd's efforts.

92.     On May 26, 2010 Boyd was featured in a New York Times article about the "$1.25 billion settlement that Mr. Boyd and several others helped negotiate." The article appeared on the front page of the National section and included a large photo of Boyd and his tractor. Ashley Southall, *Black Farmers' Bias Payments Come Too Late for Some*, N.Y. Times, May 26, 2010 at A12.

93.     Throughout the spring and summer of 2010, Boyd worked with the following lawmakers to fund the Settlement Agreement and pass the CRA in the Senate: Senate Majority Leader Harry Reid, Speaker of the House Nancy Pelosi, Senator Thad Cochran, Senator James Webb, Senator Charles Grassley, Senator Mary Landrieu, Senator Kay Hagen, Senator Blanche Lincoln, Senator Tom Harkin, Senator Mark Warner, Rep. James Clyburn (Majority Whip), Rep. John Conyers, Rep. Maxine Waters, Rep. Bennie Thompson, Rep. Bobby Scott, and others.

94.     In June 2010 Ebony magazine did a feature story on John Boyd's efforts on behalf of the late-filers entitled "Mr. Boyd Goes to Washington."

95.     On August 2, 2010 CQ Today ran another article about legislative efforts to fund the Settlement Agreement, again quoting Boyd, and describing him as having "pressed both Reid and House Speaker Nancy Pelosi for action." Ellyn Ferguson, *Senate Tries Again on Settlements for American Indians, Black Farmers*, CQ Today, August 2, 2010, p. 7.

96.     On August 4, 2010 Senator Mark Warner, speaking on the floor of the Senate, urged the Senate to approve funding for the Settlement Agreement. Senator Warner

acknowledged Boyd in his remarks, stating "this issue was first brought to my attention by John Boyd…" 156 Cong.Rec. 117, S6715 (August 4, 2010)(Statement of Sen. Mark Warner).

97.     On August 5, 2010 Senator Grassley called for the Senate to approve funding for the settlement, stating, "There is an advocate for the Black farmers—John Boyd. I have been working with him for a long period. He was working hard on this a long time before I was. We should be getting this resolved for the benefit of the farmers but also for the advocates, those people who have been working so hard finding ways to get it done."  156 Cong.Rec. 118, S.6800 (August 5, 2010)(Statement of Charles Grassley).

98.     During September and October 2010, Boyd continued working very closely lawmakers, including Senate Majority Leader Harry Reid, and also met with administration officials, including Secretary Vilsack. During this time, Boyd also continued to hold rallies, including a rally in Washington, D.C. on September 16, 2010. Boyd reported to, and at times coordinated his activities with, defendants and members of the Crowell team.

99.     On September 23, 2010 Senators Landrieu, Hagan and Lincoln joined Boyd at a press conference to urge the Senate to pass funding legislation for the Settlement Agreement.

100.    On October 21, 2010, Boyd met at the White House with top aides to President Obama to discuss a plan for obtaining funding for the Settlement Agreement.

101.    On November 19, 2010, the Senate passed the CRA (including funding of $1.25 billion) and sent the measure back to the House for consideration of the Senate amendments.

102.    On November 30, 2010 the House debated the Senate amendments to the CRA and ultimately agreed to those amendments. John Boyd's work in securing passage of the CRA and funding for the late filers was recognized and praised by three members of Congress in their remarks on the House floor. Rep. Bobby Scott thanked Boyd for his hard work over the many

years.  Rep. John Conyers noted Boyd's work on behalf of black farmers went back 27 years to 1983. Rep. Maxine Waters stated "I am so proud of John Boyd and all the members of this Congress who have worked so hard [on the CRA]." 156 Cong.Record 155, H7690-93 (November 30, 2010).

103.    Not all lawmakers supported the CRA and among those who didn't, Boyd was blamed for its passage. According to Rep. Peter King, "John Boyd, *the head of this*, who has driven a tractor around Washington, D.C. and filed his claims and made this a high priority public issue, testified there were 18,000 black farmers." Boyd was seen as so closely tied to the CRA, Rep. King argued, "Secretary Vilsack and Attorney General Eric Holder sat down with John Boyd, the head of the black farmers organization, and they cooked up *Pigford II*… They have negotiated that agreement. They have negotiated the amount. They have succeeded in getting it past the Senate after the Senate reached a point of exhaustion in fighting it. That is my reports from some of the Senators over there." 156 Cong.Rec. 153, H7638-7639 (November 29, 2010); 156 Cong.Rec. 154, H7653-54 (November 30, 2010).

104.    On December 2, 2010, Boyd attended the enrollment ceremony where Speaker Pelosi signed the enrolled version of the CRA and thanked Boyd for his "stalwart advocacy." Office of Representative Nancy Pelosi, Press Release, "Pelosi: By Compensating Black Farmers and Native Americans We Close the Door on An Old Injury," December 2, 2010 (available at the website of Rep. Nancy Pelosi, http://pelosi.house.gove/news/pressrealeases/2010/12)

105.    On December 6, 2010 House Speaker Pelosi wrote to Boyd, thanking him for his "leadership and hard work on behalf of the Pigford/Cobell settlements," and giving him the pen that was used to sign the House enrollment of the CRA.

106.    On December 8, 2010 after 10 years of effort the CRA was signed into law.  In recognition of his tireless efforts on behalf of the late filers John Boyd was invited to attend the White House signing with President Barack Obama.

107.    On December 27, 2010 the Richmond Times Dispatch did a profile of John Boyd, hailing his work on behalf of the late-filers and describing him as having "successfully pushed for a $1.15 billion settlement for black farmers." In that article, defendant Marks was quoted as saying Boyd's work was "vital" to getting the funds appropriated for the Settlement Agreement. *Faces of 2010: John W. Boyd, Jr.*, Richmond Times Dispatch, December 27, 2010.

**The Settlement Agreement And Fee Petition: Class Counsel Agree To Reward Themselves Handsomely, Take Credit For Boyd's Work And Pay Boyd Nothing**

108.    As part of the Settlement Agreement, Class Counsel and DOJ agreed to a range of attorneys' fees payable to Class Counsel, 4.1% to 7.4%, and agreed to the amount of money on which those fees would be calculated, which was defined as the "Fee Base." The Settlement Agreement defines the Fee Base as "the sum of the 2008 funds [i.e. the $100 million provided by the 2008 Farm Bill] plus any 2010 Funds, minus $22,500,000." *In re Black Farmers Discrimination Litigation*, 08-mc-511 (hereinafter "*Pigford II*"), Document Number 170-2, Section II, paragraphs A, B, O and Section X, paragraph B.

109.    At the time of the Settlement Agreement, Congress had not yet passed a bill to appropriate additional funds for payment of the late-filers claims; Boyd was continuing to work on obtaining such relief. After the passage of the Claims Resolution Act, as described above, Class Counsel and DOJ executed a revised Settlement Agreement on May 11, 2011, which specified the amount of the 2010 Funds, i.e. $1.15 billion.

110.    In the Settlement Agreement, Class Counsel on behalf of the signatory plaintiffs, including NBFA, agreed to seek appointment of Class Representatives for purposes of an

uncontested class certification procedure. The Settlement Agreement made no provision for incentive awards to be paid to any class representative or other named plaintiff. NBFA's lawyers made no attempt to explain this aspect of the Settlement Agreement to Boyd.

111.     After passage of the CRA, Class Counsel continued to use Boyd to do outreach work and asked him to travel to different cities and speak to black farmers about the settlement. Boyd once again did as he was asked based upon defendants' representations that he soon would be paid for this and all of the other uncompensated time he had put in.

112.     When Boyd questioned defendant Farrin about when he would be paid for all the work he had done and was doing, Farrin was evasive but assured Boyd that he would be paid.

113.     Pursuant to the terms of the Settlement Agreement, on March 30, 2011 Class Counsel filed a consented to Motion for Preliminary Approval of the Settlement Agreement and Memorandum in Support. In their Memorandum, Class Counsel claimed they had engaged in "extensive advocacy efforts" before Congress to get funding for the Settlement Agreement and made no mention of Boyd or NBFA.  *Pigford II,* Document Number 161-1.

114.     In or about July 2011, Boyd learned that Class Counsel Hank Sanders had been chosen by Class Counsel to oversee outreach efforts to the black farm community and intended to use the Federation of Southern Cooperatives to perform paid outreach work for Class Counsel. Sanders, who had previously served on the board of the Federation, sought and received $200,000 in implementation costs to pay the Federation for approximately 6 months of outreach work.

115.     Over the summer of 2011, Boyd became concerned that defendants were not going to live up to contract with him and pay him what he was owed.  On July 26, 2011

defendant Farrin assured Boyd that he was "a valuable member of the team" and that his concerns were not warranted.

116.    On August 8, 2011 Class Counsel filed a Motion for Final Approval of the Settlement and a Motion for an Award of Attorneys' Fees and Expenses, seeking 7.4% of the Fee Base, over $90 million.  *Pigford II*, Document Numbers 180, 180-1 and 187. In this motion, Class Counsel request $7.4 million in fees [i.e. 7.4% of $100 million] on the $100 million they did *nothing* to obtain and that was created almost exclusively through Boyd's efforts. Incredibly, Class Counsel claim *they* are responsible for Section 14102 of the 2008 Farm Bill. Making no mention of Boyd's eight-year siege on behalf of the late-filers, Class Counsel instead hold themselves out as the heroes by claiming "[s]everal of the lawyers who had served as class counsel in *Pigford* devoted substantial amounts of time to advocating on behalf of these late-filers. *Their effort*, in conjunction with the efforts of an array of farm advocacy organizations and activists…led to passage of Section 14102 of the 2008 Farm Bill." (emphasis added).  Class Counsel ask the "Court to award attorneys' fees in the amount of 7.4% of the Settlement Fund Fee Base as compensation *for the years of work they have devoted to obtaining for the Class the enormous benefits provided by the enactment of the 2008 Farm Bill...*"  (emphasis added).

117.    In fact, Class Counsel are so unfamiliar with the process by which Section 14102 of the 2008 Farm Bill was passed, their Memorandum of Law erroneously states, "this portion of the Farm Bill, [was] signed into law by President Bush on June 18, 2008." The Farm Bill, including Section 14102, was *vetoed* by President Bush and became law after two-thirds of both houses of Congress voted to override the veto. Had Class Counsel spent 8 years fighting for passage of this remedial legislation, as Boyd did, they could never have made such a misstatement.

28

118.   Class Counsel's motion for fees also claims that Class Counsel "played an active and essential role in advocating to Congress" to obtain funding for the Settlement Agreement and that "Class Counsel's efforts were a key to producing the lion's share of the funds available to fulfill the promise of Section 14102." Notably absent from this description is any mention of Boyd.

119.   When Boyd confronted defendant Farrin about Class Counsel's motion for fees and the credit taken for Boyd's work, as well as the failure to mention Boyd or seek any payment on his behalf, Farrin for the first time advised Boyd that he (Farrin) and Marks believed it would "not be legal" to pay Boyd for the work he had done because it would amount to an illegal fee agreement with a non-lawyer: having induced and advised Boyd to continue to work and defer payment for a period of time, defendants Farrin and Marks took the convenient position Boyd was seeking an illegal contingent fee.   Farrin and Marks also took that position that, because Boyd is not a lawyer, they could not seek a fee award from the Court on Boyd's behalf. Both of these positions were reiterated by defendants in a filing with the *Pigford II* Court on October 22, 2012, where defendants claimed, *inter alia*, that Boyd was merely a "public spirited layman" with no right to compensation. *Pigford II*, Document 314, pp. 2-3.

120.   On August 25, 2011 Boyd sought leave to appear and speak at the fairness hearing on the proposed settlement. Boyd's lawyers, defendants herein, opposed and moved to strike Boyd's motion.  *Pigford II*, Document Numbers 196, 198.

121.   On October 27, 2011 the Court in *Pigford II* gave final approval to the proposed class settlement, including the payment to Class Counsel of between $51 million and $92 million. By agreement among counsel, defendants will receive the largest share of those fees.

## V.      COUNTS

### Breach of Fiduciary Duty and Disgorgement

122.      Defendants are attorneys who represented NBFA and John Boyd in connection with *Pigford II*.  Defendants had a duty to plaintiffs to act in plaintiffs' best interests, to disclose any conflict between plaintiffs and defendants, and to be truthful in their dealings with plaintiffs.

123.      Plaintiffs relied upon and trusted defendants, their attorneys, to represent their interests in connection with *Pigford II* and to be truthful in all dealings with them.

124.      Defendants breached their duty to Plaintiff in the following ways:

a)      Defendants induced plaintiff Boyd to continue to work on behalf of the claimants in *Pigford II* by promising Boyd that he would be compensated for such work, when in fact defendants had no intention of compensating plaintiff or of seeking compensation from the Court for the considerable work done by plaintiff. Contrary to the representations made to their client, after Boyd labored for years and helped defendants obtain the money they needed for the claimants and themselves, defendants took the position that: 1) it would be illegal to compensate Boyd for that effort and 2) there was no basis in law for seeking compensation for Boyd from the Court. As lawyers, defendants should not have assured Boyd he would be compensated and requested his continued effort if defendants believed it would be illegal to compensate him. As lawyers, defendants should have not assured Boyd they would seek compensation for Boyd from the Court if they believed there was no basis in law for seeking such compensation;

b)      Defendants allowed, requested and encouraged Boyd to continue to work for and with them, knowing that Boyd expected to be paid and took no steps to inform Boyd that he would not be paid;

c)      Defendants submitted filings to the Court in *Pigford II* seeking compensation for themselves for the work that was done by their client (plaintiff). Defendants did not seek any compensation for Boyd but rather actively opposed any effort by Boyd to receive compensation for the work he did and to inform the Court about the work he did;

d)      In an effort to silence Boyd about the work he did and for which defendants sought credit and payment, defendants opposed the efforts of their client to be heard at the fairness hearing in *Pigford II*;

e)      Defendants named NBFA as a plaintiff in the *Pigford II* litigation and used the stature and reputation of NBFA and Boyd to gain credibility with the Court and the *Pigford II* claimants, all for their own purposes and not for the benefit of NBFA and Boyd. In other words, defendants used their client to benefit themselves;

f)      Defendants did not seek any compensation for NBFA, their client, for its work as a lead plaintiff in *Pigford II*;

g)      Defendants put their own interests above those of their clients and did not immediately disclose to their client when their interests became adversarial to those of their client;

125.    As a direct and proximate result of defendants' breach of fiduciary duty to Boyd, Boyd was induced to and did expend hundreds of hours working on obtaining relief for the *Pigford II* claimants and has received no compensation for that effort.

126.    As a direct and proximate result of defendants' breach of fiduciary duty to plaintiff NBFA, the name and reputation of NBFA was exploited for the benefit of defendants and to the detriment of NBFA;

127.    As a direct and proximate result of defendants' breach of fiduciary duty to plaintiff NBFA, NBFA was denied the opportunity to seek compensation for its role as a lead plaintiff in *Pigford II*.

128.    As a direct and proximate result of defendants' breach of fiduciary duty to plaintiffs, defendants have been awarded compensation to which they were not entitled.

129.    The proper remedy for defendants' breach of fiduciary duty and breach of the duty of loyalty to their clients is disgorgement of all fees received and to be received in connection with defendants' representation of plaintiffs.

**Quantum Meruit**

130.    Defendants have been awarded and will in the future receive tens of millions of dollars in attorneys' fees in connection with *Pigford II*.

131.    Defendants' fees in *Pigford II* are a percentage of the fund available to pay claimants in that case.

132.    From 2000 through 2010, Boyd performed thousands of hours of work to create the common fund upon which defendants' fees are calculated and from which defendants' fees are payable.

133.    Defendants have refused to compensate Boyd for the work he did to create the fund but rather have retained and will retain for themselves tens of millions of dollars created in part by plaintiff's efforts.

134.    It would be unjust to allow defendants to retain the benefit created by Boyd's efforts without any compensation to Boyd.

135.    Boyd is entitled to restitution, as measured by the value of the services Boyd conferred on defendants.

**Breach of Contract**

136.    Defendants agreed to pay Boyd for the work he did from 2008 through 2011 to obtain a legislative remedy and funding for the late-filers.

137.    In reliance on defendants' promise to pay, Boyd worked for defendants from July 2008 through July 2011 but only received a small portion of the total compensation due for that work.

138.    In breach of their agreement with Boyd, defendants have refused to pay Boyd money owed for the work he performed.

**VI.    PRAYER FOR RELIEF AND JURY DEMAND**

Wherefore, and for all the foregoing reasons, plaintiff s respectfully requests:

1.    That the Court enter judgment in plaintiffs' favor against defendants for breach of fiduciary duty and award the plaintiffs an amount equal to the attorneys' fees paid or payable to defendants (disgorgement) in connection with their representation of plaintiffs;

2.  That the Court enter judgment in plaintiffs' favor against the defendants in quantum

    meruit and award the plaintiffs restitution in an amount equal to the value of the

    services conferred upon defendants;

3.  A jury trial on Boyd's claim for breach of contract.


                                    **JOHN W. BOYD, JR.,**
                                    **Individually and On Behalf of**
                                    **NATIONAL BLACK FARMERS**
                                    **ASSOCIATION, INC.**
                                    By and Through His Attorneys,


                                    /s/_____
                                    Alexander J. Pires, Jr.
                                    DC Bar #185009
                                    Diane E. Cooley
                                    DC Bar #431817
                                    **PIRES COOLEY**
                                    4401 Q St. NW
                                    Washington, DC 20007
                                    (202)905-6706
                                    farmerslawyer@aol.com
                                    dianecooley@pirescooley.com

DATE: November 21, 2012